UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

MARCUS WASHINGTON,

Petitioner,

v.

JEREMY BEAN,[1] *et al.*,

Respondents.

Case No. 3:19-cv-00256-MMD-CSD

ORDER

## I.    SUMMARY

Petitioner Marcus Washington was sentenced in Nevada state court to life without the possibility of parole, with a consecutive 96- to 240-month enhancement, after being found guilty of first-degree murder with the use of a deadly weapon. (ECF No. 17-13.) This matter is before this Court for adjudication of the merits of Washington's First-Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 16 ("Petition.").) Petitioner alleges trial court errors, prosecutorial misconduct, and the ineffective assistance of his trial counsel. (*Id.*) For the reasons discussed below, the Court grants the Petition on grounds 1, 3c, and 3d.

## II.    BACKGROUND

### A.    Factual background[2]

Vincent Brown testified that on July 24, 2011, he and his friend Robert Hicks entered the courtyard of the Island Court Apartments in Las Vegas, Nevada, and Hicks

---

[1]According to the Nevada Department of Corrections' inmate locator page, Washington is incarcerated at High Desert State Prison. Jeremy Bean is the current warden for that facility. The Court directs the clerk to substitute Jeremy Bean as a respondent for Respondent Warden William Gittere. *See* Fed. R. Civ. P. 25(d).

[2]The Court makes no credibility or other factual findings regarding the truth or falsity of trial evidence before the state court.

started arguing with another man who Brown did not know. (ECF No. 37-1 at 161-162, 165, 169.) The other man told Hicks to leave because Hicks was encroaching on the man's territory. (*Id*. at 170.) The other man then indicated to Hicks that he was going to get his gun. (*Id*. at 175.) Brown watched the man leave and enter apartment number 13. (*Id*. at 178.) When the man exited the apartment a short time later, he had a gun and started shooting at Hicks. (*Id*. at 180.) Hicks was shot and killed. (*Id*. at 191.) Nine cartridge casings for a 9-millimeter gun were later found at the scene. (ECF No. 36-2 at 69, 74.)

Dr. Timothy Dutra, a medical examiner for the Clark County Office of the Coroner and Medical Examiner, testified that he performed Hicks's autopsy. (*Id*. at 31, 33.) Dr. Dutra testified that Hicks had been shot "to the right of the back of the neck just below the skull" and that the bullet exited his left cheek. (*Id*. at 37.) Based on a toxicology analysis, Dr. Dutra determined that Hicks had alcohol and PCP in his system at the time of his death. (*Id*. at 50.)

Detective Barry Jensen with the Las Vegas Metropolitan Police Department interviewed Donald Williams, Washington's uncle, after the shooting. (ECF No. 38-1 at 44, 48-49.) Williams told police that Washington was the shooter. (*Id*. at 95.) During Washington's trial, Williams testified that he was living in apartment number 13 of the Island Court Apartments on July 24, 2011; however, Williams denied telling the police that Washington was the shooter. (ECF No. 37-1 at 213, 215, 221.) Williams, who had refused to come to court to testify and, as a result, was in custody at the time of Washington's trial, testified that he was "high on PCP" at the time of his police interview and that he was asleep at the time of the shooting. (*Id*. at 214-15, 225.)

Three days after the murder, Washington was arrested at 300 Madison Avenue, following the execution of an unrelated search warrant, which Washington alleged was in fact a furtive effort to arrest him and obtain incriminating evidence against him. (ECF No. 40-1 at 252-53.) A gun was found during this search, but, notably, forensic tests proved that it was not the gun used to kill Hicks. (ECF No. 37-1 at 59.)

The defense presented Dr. Melvin Pohl, a medical director of a drug treatment program, to testify about the effects PCP had on Williams at the time of his police interview. (ECF No. 39-1 at 72.) The defense also called Devin Belanger, who testified that she was a confidential informant for police, had assisted law enforcement in a controlled drug buy at 300 Madison Avenue, and, importantly, saw Jason Owens shoot Hicks. (*Id.* at 124, 139-41.) In rebuttal, Detective Joseph Zepeda testified that Belanger had not done the controlled drug buy at 300 Madison Avenue and that Belanger had told him that Washington was the shooter. (ECF No. 40-1 at 26-27.)

**B.    Procedural Background**

A jury found Washington guilty of first-degree murder with the use of a deadly weapon. (ECF No. 17-13.) Washington was sentenced to life without the possibility of parole for the first-degree murder conviction and received a consecutive term of 96 to 240 months for the deadly weapon enhancement. (*Id.*) Washington appealed, and the Nevada Supreme Court affirmed. (ECF No. 18-3.) Washington unsuccessfully sought post-conviction review before the state court. (ECF Nos. 18-5, 18-11.) Washington then appealed, and the Nevada Supreme Court affirmed. (ECF No. 18-15.)

Washington transmitted his original *pro se* petition for writ of habeas corpus to this Court on May 13, 2019. (ECF No. 1.) This Court granted Washington's motion for appointment of counsel and appointed the Federal Public Defender ("FPD") to represent Washington. (ECF Nos. 3, 13.) Washington filed the instant counselled Petition on March 5, 2020. (ECF No. 16.) Respondents moved to dismiss the Petition, and the Court granted the request in part, finding that ground 3 was procedurally defaulted and deferring consideration of the cause and prejudice arguments for ground 3 under *Martinez v. Ryan*, 566 U.S. 1 (2012), until the time of merits review. (ECF No. 66.) Respondents answered the Petition on June 16, 2023, and Washington replied on May 14, 2024. (ECF Nos. 106, 117.) On June 27, 2024, Washington moved for an evidentiary hearing, Respondents opposed the request, and Washington replied. (ECF Nos. 120, 124, 125.)

Washington raises the following grounds for relief in his Petition:

1a.     The trial court improperly excluded Owens's confession.

1b.     The trial court allowed the State to elicit hearsay testimony.

2a.     The State suppressed materially exculpatory evidence.

2b.     The State engaged in misconduct and bad faith by arguing that Belanger was not a confidential informant.

2c.     The State engaged in misconduct by presenting false testimony regarding the investigation of 300 Madison Avenue and statements made by Belanger to Detective Zepeda.

3a.     His trial counsel failed to object to and move to strike evidence presented by the State on rebuttal.

3b.     His trial counsel failed to impeach, object to, and move to strike demonstrably false evidence presented by the State on rebuttal.

3c.     His trial counsel failed to object to inadmissible hearsay testimony elicited from Detective Zepeda.

3d.     His trial counsel opened the door and stipulated to the State's presentation of inadmissible bad act evidence and failed to object to improper argument relating to the bad act evidence by the State during closing statements.

3e.     His trial counsel failed to object to the closure of his trial to the public.

(ECF No. 16.)

## III.   STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court."

4

*Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75). *See also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

IV.   **DISCUSSION**

A.   **Ground 1--Trial Court Errors**

In ground 1, Washington contends that the trial court erred in entering various rulings during trial and denied him his constitutional guarantees of due process, equal protection, a fair trial, and right to present a defense. (ECF No. 16 at 9.) Ground 1 contains two subparts: ground 1a and ground 1b.

///

///

///

1          **1.      Ground 1a—exclusion of Jason Owens's confession**

2          In ground 1a, Washington alleges that he was denied his constitutional rights to

3    due process, a fair trial, and to present a defense when the trial court excluded Jason

4    Owens's confession. (ECF No. 16 at 9.)

5                    **a.      Background information**

6          During the trial, the State requested that the trial court limit the defense's

7    questioning of Belanger regarding statements made to her by Owens, arguing that they

8    amounted to inadmissible hearsay. (ECF No. 38-1 at 29.) The trial court asked for an offer

9    of proof of Belanger's proposed testimony and the circumstances surrounding Owens's

10   confession to Belanger, explaining, "[a] statement tending to expose a declarant to

11   criminal liability and offer to exculpate the [accused] is not admissible unless the

12   corroborating circumstances clearly indicate the trustworthiness of the statement." (*Id*. at

13   32-34.)

14         The following day, outside the presence of the jury, Belanger testified that she

15   overheard her drug dealer, Owens, tell Washington that he—Owens—was the one who

16   committed the murder. (ECF No. 39-1 at 18-20.) Belanger then testified that, the following

17   day, she asked Owens about the murder, and Owens "admitted that he did do it." (*Id*. at

18   21.) In arguing that these confessions should be admissible, Washington's trial counsel

19   pointed out that the State was allowed to elicit Owens's hearsay statements to Detective

20   Jensen denying involvement in the shooting,[3] so it was inherently unfair to disallow

21   Washington from presenting Owens's hearsay statements in rebuttal. (*Id*. at 27.) The trial

22   court disagreed, finding that Detective Jensen's testimony about Owens's denial of

23   involvement in the shooting was not offered for the truth of the matter asserted but was

24   used to show "the investigative techniques that the detective used." (*Id*.) The trial court

25   then ruled that it would not allow Belanger to testify to Owens's confessions, explaining,

26

27

28         [3]Detective Jensen testified that Owens had denied he had "ever . . . done th[e] shooting." (ECF No. 38-1 at 63.)

"in talking with her, it doesn't appear . . . that her statement is trustworthy. She's over there doing drugs. This is her drug house. She kind of changed her . . . testimony." (*Id*.)

### b. State court determination

In its affirmation of Washington's judgment of conviction, the Nevada Supreme Court held:

> Washington argues that he was deprived of his right to present a defense when the district court excluded Belanger's hearsay testimony that Owens confessed to the murder. This court "generally review[s] a district court's evidentiary rulings for an abuse of discretion." *Chavez v. State,* 125 Nev. 328, 339, 213 P.3d 476, 484 (2009). We conclude that the district court did not abuse its discretion.
>
> NRS 51.345(1) provides that "a [hearsay] statement tending to expose the declarant to criminal liability and offered to exculpate the accused in a criminal case is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."
>
> > [FN1] Washington appears to argue that the constitutionality of NRS 51.345(1) is questionable. On the contrary, we have recently decided that NRS 51.345(1) is indeed constitutional. *See Coleman v. State,* 130 Nev._, _, 321 P.3d 901, 907 (2014).
>
> Washington argues that Belanger's proposed testimony meets the requirements of NRS 51.345(1). Because neither side questions that the hearsay statement would incriminate Owens, the issue is whether the statement is sufficiently trustworthy. In *Coleman,* this court analyzed the same legal issue by considering the following factors used by the Fourth Circuit Court of Appeals:
>
> > (1) whether the declarant had at the time of making the statement pled guilty or was still exposed to prosecution for making the statement, (2) the declarant's motive in making the statement and whether there was a reason for the declarant to lie, (3) whether the declarant repeated the statement and did so consistently, (4) the party or parties to whom the statement was made, (5) the relationship of the declarant with the accused, and (6) the nature and strength of independent evidence relevant to the conduct in question.
>
> *Coleman,* 130 Nev. at _, 321 P.3d at 909 (quoting *United States v. Kivanc,* 714 F.3d 782, 792 (4th Cir. 2013)).
>
> Applied to this case, the first factor weighs in favor of trustworthiness because Owens was still exposed to potential prosecution for the murder. The third factor weighs against trustworthiness because there is no evidence that the statement, though possibly repeated to Belanger twice (it is unclear from her testimony), was made to anyone else on a second occasion. The fourth factor weighs against trustworthiness because the district court found that Belanger, the person who overheard the statement, was using heroin at the time the statement was allegedly made. The sixth

factor weighs against trustworthiness: There is no independent evidence supporting the statement and the statement contradicts eyewitness testimony that Owens was not at the scene. The other factors cannot be assessed under the facts of this case.

In sum, three of the six factors weigh against the statement's trustworthiness. We cannot therefore say that the district court abused its discretion by excluding the statement under NRS 51.345(1). *See, e.g., Jackson v. State,* 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001) ("An abuse of discretion occurs if the district court's decision is arbitrary or capricious or if it exceeds the bounds of law or reason.").

Washington argues in the alternative that Belanger's testimony should have been admitted under NRS 51.069(1). NRS 51.069(1) provides that "[w]hen a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked or supported by any evidence which would be admissible for those purposes if the declarant had testified as a witness." The district court permitted Detective Jensen to testify that his conversation with Owens convinced him that Owens was not involved in the case. Washington argues that Belanger's testimony was admissible in order to rebut the hearsay testimony of Detective Jensen.

Washington's argument is not persuasive. Owens' statement to Detective Jensen was not hearsay because it was not offered to prove the truth of the matter asserted. *See* NRS 51.035. The defense's questioning brought into question the adequacy of Detective Jensen's investigatory techniques: "Q: You had access to [Owens] didn't you? . . . It's not hard to pick up the phone and ask him, right?" The State's direct examination attempted to justify Detective Jensen's investigatory techniques: "Q: Talking to Mr. Owens ... did you have any indication whatsoever in your discussions with him that at least superficially he was involved in this? A: No, not at all." Only when Washington objected to this question as vague did the State ask, "Did he deny that he had . . . done this shooting?" The detective replied, "Yes, he did."

As this line of questioning shows, the State was interested in whether Detective Jensen had reason to consider Owens as a suspect or as possessing any relevant information. The issue was the adequacy of Detective Jensen's investigation. Owens' out-of-court denial was not hearsay because it was not offered to prove the truth of Owens' statement.

[FN2] Because Owens' denial was not hearsay, Washington's Confrontation Clause argument lacks merit. *See Crawford v. Washington,* 541 U.S. 36, 59 n.9 (2004) ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.").

Accordingly, Washington was not permitted to introduce Belanger's hearsay testimony to rebut hearsay under NRS 51.069(1).

(ECF No. 18-3 at 3-6.)

///

1

### c.    Standard

2      "The right of an accused in a criminal trial to due process is, in essence, the right

3    to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*,

4    410 U.S. 284, 294 (1973). *See also Washington v. Texas*, 388 U.S. 14, 19 (1967)

5    (explaining that an accused "has the right to present his own witnesses to establish a

6    defense" and that "[t]his right is a fundamental element of due process of law"); *DePetris*

7    *v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) ("The Supreme Court has made clear

8    that the erroneous exclusion of critical, corroborative defense evidence may violate both

9    the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to

10   present a defense."). "[T]he Constitution [also] guarantees criminal defendants 'a

11   meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S.

12   683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). A

13   defendant's opportunity to be heard "would be an empty one if the State were permitted

14   to exclude competent, reliable evidence . . . when such evidence is central to the

15   defendant's claim of innocence." *Id*. This is because, "[i]n the absence of any valid state

16   justification, exclusion of . . . exculpatory evidence deprives a defendant of the basic right

17   to have the prosecutor's case encounter and 'survive the crucible of meaningful

18   adversarial testing.'" *Id*. at 690-91 (quoting *United States v. Cronic*, 466 U.S. 648, 656

19   (1984)).

20      The United States Supreme Court has "never questioned the power of States to

21   exclude evidence through the application of evidentiary rules that themselves serve the

22   interests of fairness and reliability—even if the defendant would prefer to see that

23   evidence admitted." *Crane*, 476 U.S. at 690. *See also United States v. Scheffer*, 523 U.S.

24   303, 308 (1998) ("A defendant's right to present relevant evidence is not unlimited, but

25   rather is subject to reasonable restrictions."). In fact, the Supreme Court has indicated its

26   approval of "well-established rules of evidence [that] permit trial judges to exclude

27   evidence if its probative value is outweighed by certain other factors such as unfair

28   prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South*

*Carolina*, 547 U.S. 319, 326 (2006). And evidentiary rules do not violate a defendant's constitutional rights unless they "infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 324 (alteration in original) (internal quotation marks omitted). *See also Scheffer*, 523 U.S. at 315 (explaining that the exclusion of evidence pursuant to a state evidentiary rule is unconstitutional only where it "significantly undermined fundamental elements of the accused's defense"). "In general, it has taken 'unusually compelling circumstances . . . to outweigh the strong state interest in administration of its trials.'" *Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009) (internal quotation marks omitted). Indeed, "[o]nly rarely ha[s] the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013).

The Ninth Circuit Court of Appeals has "traditionally applied a balancing test to determine whether the exclusion of evidence in the trial court violated [a] petitioner's due process rights, weighing the importance of the evidence against the state's interest in exclusion." *Chia v. Cambra*, 360 F.3d 997, 1003 (9th Cir. 2004). In assessing these interests, the Court looks to the following factors: "(1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense." *Id*. at 1004.

### d.    Analysis

The trial court determined that Belanger's testimony about Owens's confessions lacked trustworthiness under Nevada law—specifically Nevada Revised Statute § 51.345(1). And the Nevada Supreme Court, the final arbiter of Nevada law, agreed. As such, the balancing test in this matter looks to Nevada's interest in excluding untrustworthy hearsay statements on the one hand and Washington's due process rights on the other. *See Chia*, 360 F.3d at 1003 ("It is clearly established federal law, as determined by the Supreme Court, that when a hearsay statement bears persuasive

assurances of trustworthiness and is critical to the defense, the exclusion of that statement may rise to the level of a due process violation."); *Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) ("[A]t times a state's rules of evidence cannot be mechanistically applied and must yield in favor of due process and the right to a fair trial.").

In conducting this balancing test, the first factor is the probative value of the excluded evidence. Belanger's testimony about Owens's confessions to the murder would have directly contradicted the State's case and would have certainly been beneficial exculpatory defense evidence demonstrating Washington's innocence. This unpresented evidence clearly had ample probative value.

Turning to the reliability of the excluded evidence, this factor cuts in favor of excluding the evidence. During Belanger's trial testimony, at a bench conference, the trial judge stated that he "really [did not] believe [Belanger] now, at all. She's changed her story so much." (ECF No. 39-11 at 215.) Given the trial court's finding regarding Belanger's lack of credibility, her testimony about Owens's confession may lack reliability. *See Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.").

The other three factors—whether the excluded evidence was capable of evaluation by the trier of fact, whether the excluded evidence was cumulative, and whether the evidence constituted a major part of the attempted defense—all favor allowing the evidence to be presented. First, the jury could have evaluated whether Owens's confession to Belanger and Owens's statement to Washington that Belanger allegedly overheard were true or not given that (1) the State would have tested the statements' reliability during cross-examination and (2) the jury could have compared Owens's denial of involvement to Detective Jensen with his admissions of guilt to Belanger and to Washington that Belanger purportedly overheard. Second, there was no other evidence presented at trial that Owens confessed to shooting Hicks. And third, Owens's

confessions to Belanger and to Washington amounted to a major part of Washington's defense that Owens was the shooter—not him.

In weighing these factors, this Court finds that the Nevada Supreme Court unreasonably determined that the trial court did not abuse its discretion in excluding Belanger's hearsay testimony about Owens's confessions. Indeed, given that Belanger's testimony about Owens's confessions was probative, capable of being evaluated by the jury, not cumulative of other evidence, and constituted a major part of Washington's defense, excluding this evidence violated Washington's due process rights. Accordingly, the Nevada Supreme Court's rejection of this claim amounted to an unreasonable application of clearly established federal law.

The Court must now assess whether this constitutional error was harmless. Under *Brecht v. Abrahamson*, federal habeas relief is appropriate only if the Court has grave doubt whether the trial court's error had a substantial and injurious effect or influence in determining the jury's verdict. *See* 507 U.S. 619, 267-68 (1993). The Court finds that this standard has been met. Testimony that Owens confessed to Belanger that he committed the murder, and that Belanger overheard the same confession to Washington, would have bolstered Washington's defense. Given that the State's evidence of guilt in the trial hinged on Williams's police interview, which Williams reneged at the trial, and Belanger's alleged statements to the police, which Belanger refuted at the trial, testimony of Owens's confessions would have been critical to the jury's ultimate determination of guilt.

### 2.    Ground 1b—elicitation of hearsay

In ground 1b, Washington alleges that he was denied his constitutional right to due process and a fair trial when the trial court allowed the State to elicit hearsay testimony from Detective Zepeda inculpating Washington. (ECF No. 16 at 14.)

### a.    Background information

During the State's case on rebuttal, the State indicated that it was going to call Detective Zepeda to show that Belanger was "not a truthful person." (ECF No. 40-1 at 6.) Detective Zepeda testified that he contacted Belanger on July 27, 2011, because

Detective Jensen had told him "that supposedly . . . Belanger could purchase the gun that was supposedly used in the murder" of Hicks. (*Id*. at 21, 22, 24, 28.) Belanger told Detective Zepeda that she was a witness to Hicks's homicide and that Washington was the shooter, describing Hicks "as being killed like a dirty dog." (*Id*. at 26-27.) Belanger then told Detective Zepeda that the gun was located at 300 Madison Avenue, but as Detective Zepeda and Belanger were driving to that location in anticipation of Belanger purchasing the gun as a confidential informant for the police, Belanger "mentioned that she had a problem with Marcus Washington regarding a money debt." (*Id*. at 28-30.) Because Belanger believed Washington may have been at the Madison Avenue location, Detective Zepeda decided against the gun purchase. (*Id*. at 38-39.)

Later, outside the presence of the jury, the State explained the following with regard to its lack of pretrial disclosure of Detective Zepeda's inculpatory testimony:

> In the State's opinion, that information is rebuttal. That is not something that gets turned over to the defense. That is rebuttal evidence. Devin Belanger got up there and said, Playboy [Owens] committed this crime. I saw it. I was there. She tells Detective Zepeda, Marcus Washington committed this crime. I was there. I saw it. That's what she did. That's rebuttal evidence, Your Honor.

(*Id*. at 58.)

### b.    State court determination

In its affirmation of Washington's judgment of conviction, the Nevada Supreme Court held:

> Washington argues that his rights under the Equal Protection and Confrontation Clauses of the United States Constitution were violated when the State elicited testimony from Detective Zepeda that Belanger told him that she saw Washington shoot the victim. He argues that it was unfair for the court to allow Detective Zepeda's hearsay testimony but prohibit Belanger's hearsay testimony regarding Owens' confession.
> We fail to see how it violates equal protection for the court to rule differently on the different out-of-court statements. The district court could consistently find Detective Zepeda's testimony about what Belanger said to him to be reliable while at the same time finding that Belanger's testimony about what Owens said to her to be unreliable. The circumstances surrounding the two statements are completely different. Moreover, because Belanger was available to testify as to whether she said that statement to Detective Zepeda, there is no Confrontation Clause violation.

*See Delaware v. Fensterer,* 474 U.S. 15, 22 (1985) ("[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony."). Therefore, Washington's argument lacks merit.

(ECF No. 18-3 at 6-7.)

### c.    Standard

"A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). "[C]laims deal[ing] with admission of evidence" are "issue[s] of state law," *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), and "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764 (1990). The issue before this Court is "whether the state proceedings satisfied due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). In order for the admission of evidence to provide a basis for habeas relief, the evidence must have "rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). Not only must there be "*no* permissible inference the jury may draw from the evidence," but also the evidence must "be of such quality as necessarily prevents a fair trial." *Jammal*, 926 F.2d at 920 (emphasis in original) (citation omitted).

### d.    Analysis

Washington contends that the Nevada Supreme Court's conclusion that his constitutional rights were not violated was unreasonable given that this conclusion relied on the erroneous implied finding that Detective Zepeda's testimony was admissible. (ECF No. 117 at 32.) For the reasons discussed below, the Court agrees. As such, the Court reviews this ground de novo. *See Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) ("As a result of [the state court's] error, our review of petitioner's underlying . . . claim is unencumbered by the deference AEDPA normally requires").

Detective Zepeda's rebuttal testimony that Belanger told him that she saw Washington shoot Hicks was impermissibly admitted. First, this testimony was evidence of Washington's guilt, so it should have been presented—if at all—during the State's case in chief. Second, although the State packaged this testimony as impeachment evidence to impeach Belanger's credibility, this evidence was offered to prove the truth of the matter asserted—that Washington was the shooter—so it was hearsay. Third, the evidence does not fall under the inconsistent-statement exception to the hearsay rule given that Belanger was not subject to cross-examination concerning the statement. *See* NRS § 51.035(2)(a). Fourth, even if this testimony was being utilized strictly as impeachment evidence, the jury was not given a limiting instruction to that effect. Fifth, the evidence amounted to inadmissible extrinsic evidence. *See* NRS § 50.135(2).

The Court now turns to consider de novo whether the presentation of this inadmissible evidence rendered Washington's trial fundamentally unfair. Detective Zepeda's testimony that Belanger told him she saw Washington shoot Hicks was undoubtedly damaging to Washington's defense because it upended the strongest defense evidence. Indeed, Detective Zepeda's testimony negated Belanger's exculpatory testimony, providing a momentous nullification of the defense's case. Moreover, regarding the timing of this evidence, Detective Zepeda's testimony was not disclosed to the defense before the trial and was only presented during the State's rebuttal, meaning Washington's defense was damaged at a point in the trial when he was unable to attempt repairment. Given these significant issues, the Court finds that Detective Zepeda's inadmissible testimony regarding Belanger's statement rendered Washington's trial fundamentally unfair.

### 3.    Conclusion

Given that (1) the trial court's preclusion of Belanger's testimony about Owens' confessions violated Washington's due process rights and was not harmless and (2) the trial court's allowance of Detective Zepeda's inadmissible rebuttal testimony about

1    Belanger's statement rendered Washington's trial fundamentally unfair, the Court finds

2    that Washington is entitled to federal habeas relief on ground 1.[4]

3          **B.    Ground 2--Prosecutorial Misconduct**

4          In ground 2, Washington alleges that his conviction violates the federal

5    constitutional guarantees of due process, equal protection, trial before an impartial jury,

6    and a reliable sentence due to a consistent pattern of prosecutorial misconduct and

7    overreach which distorted the fact-finding process and rendered his trial fundamentally

8    unfair. (ECF No. 16 at 16.)

9          **1.    Standard for prosecutorial misconduct claims**

10         "[T]he touchstone of due process analysis in cases of alleged prosecutorial

11   misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v.*

12   *Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors'

13   comments 'so infected the trial with unfairness as to make the resulting conviction a denial

14   of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v.*

15   *DeChristoforo*, 416 U.S. 637, 643 (1974)). In making that determination, this Court looks

16   to various factors: "the weight of the evidence, the prominence of the comment in the

17   context of the entire trial, whether the prosecution misstated the evidence, whether the

18   judge instructed the jury to disregard the comment, whether the comment was invited by

19   defense counsel in summation and whether defense counsel had an adequate

20   opportunity to rebut the comment." *Floyd v. Filson*, 949 F.3d 1128, 1150 (9th Cir. 2020)

21   (quoting *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010)). "[P]rosecutorial misconduct[]

22   warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining

23   the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v.*

24   *Abrahamson*, 507 U.S. 619, 637-38 (1993)).

25   ///

26   ///

27

28         [4]As a practical matter, it may be redundant to discuss the remaining grounds given
     that this Court has already concluded that Washington is entitled to federal habeas relief
     and a retrial. However, in an abundance of caution, the Court discusses them as follows.

16

### 2.    Ground 2a—suppression of evidence

In ground 2a, Washington alleges that the State suppressed materially exculpatory and impeachment evidence pertaining to Belanger's cooperation with law enforcement in violation of his due process rights. (ECF No. 16 at 17.) Specifically, Washington takes issue with the State's concealment of evidence pertaining to Belanger's assistance to police in investigating Hicks's murder and other illicit activity at 300 Madison Avenue. (*Id*.)

### a.    Background information

Before trial, in an opposition to a motion to disclose informants, the State asserted that it was "unaware of any confidential informant who could provide information material to guilt or . . . Washington's defense." (ECF No. 32-5 at 7.)

During the State's case in chief, Detective Jensen testified that, during the course of his investigation, another "person's name c[a]me up as somebody who might have been the shooter." (ECF No. 38-1 at 60.) Detective Jensen explained that "[t]hat information came from . . . Devon Bellinger [sic]" and that she gave "an individual by the name of Playboy [Owen's street name] . . . to [him] as the possible shooter." (*Id*.) Detective Jensen then testified that after speaking with Owens, he "eliminated him as a suspect." (*Id*. at 60.) Detective Jensen spoke with Belanger on three or four occasions, and her story changed "dramatically," undermining his trust in Belanger's statements. (*Id*. at 65.)

Later, during the defense's case-in-chief, Belanger testified that in addition to speaking with Detective Jensen on several occasions, she "did a controlled buy" at 300 Madison Avenue, the location where Washington was later found. (ECF No. 39-1 at 212.) Outside the presence of the jury, the State explained that (1) it met with Belanger before she testified, and Belanger "told [them] at the end of the interview that she was a confidential informant that went in there and did the buy, and she gave the information in regard to the gun"; (2) Belanger told the State not to "tell the defense attorneys that because [she did not] want that information to get out"; (3) after Belanger's testimony, the State contacted Detective Zepeda to ask about Belanger's controlled drug buy; and (4) "[i]n the State's opinion, [Detective Zepeda's] information [about Belanger telling him that

Washington was the shooter] is rebuttal" and "is not something that gets turned over to the defense." (ECF No. 40-1 at 57-58.)

Detective Zepeda told the State the same information that he later testified to at trial: (1) Belanger told him that Washington was the shooter; (2) "Detective Jensen had told . . . [him] personally, that supposedly this Devin Belanger could purchase the gun that was supposedly used in the murder," so he was thinking of using her as a confidential informant; (3) he and Belanger drove to 300 Madison Avenue, the location where Belanger indicated the murder weapon would be located, and then back to the police station; (4) while in route back to the police station, Belanger "mentioned that she had a problem with Marcus Washington regarding a money debt"; (5) at the police station, while Belanger waited in his car and then began paperwork to become a confidential informant, he "regroup[ed] with other people that were involved from another unit" because "there [were] other investigations going on in regard to 300 Madison" at this time; (6) during that meeting with other law enforcement officers, it was decided that "they were going to use Detective Perry's . . . confidential informant as opposed to Devin Belanger" to "go into the 300 Madison Avenue address" because the other informant was more reliable and "using Ms. Belanger . . . could cause some problems if Mr. Washington was at the residence where the gun was going to be bought"; (7) Belanger did not think that Washington would be at 300 Madison Avenue, "but she thought maybe"; (8) Belanger was taken home after the decision was made to not use her as a confidential informant; and (9) he never worked with Belanger before or after this incident. (ECF No. 40-1 at 27-39.)

Detective Jensen was recalled as a rebuttal witness for the State. (*Id*. at 210.) During his rebuttal testimony, Detective Jensen explained the following: (1) Belanger called him "and said that she may be able to locate a weapon that was used in the shooting"; (2) he told Belanger that he was going to have another detective call her; and (3) he "got a hold of another detective bureau that . . . do[es] this stuff all the time." (*Id*. at 227-31.) During cross-examination, Detective Jensen testified (1) that he never heard anything about Belanger telling Detective Zepeda that Washington was the shooter; and

(2) he "mention[ed] in [his] report that Devin Belanger called [him] and told [him] that she could possibly locate a weapon . . . that may have been used in the murder," but he did not mention the connection of the weapon with 300 Madison Avenue. (*Id*. at 238, 244.)

### b.    State court determination

In its affirmation of Washington's judgment of conviction, the Nevada Supreme Court held that "Washington's argument that the State unlawfully concealed evidence fails because Washington was able to cross-examine Detective Jensen after he became aware of evidence contradicting the detective's testimony. *See Madsen v. Dormire,* 137 F.3d 602, 605 (8th Cir. 1998)." (ECF No. 18-3 at 7.)

### c.    Standard

"[T]he suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Because a witness's "'reliability . . . may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the *Brady*] rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The materiality of the evidence that has been suppressed is assessed to determine whether prejudice exists. *See Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

"A 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id*. (quoting *Bagley*, 473 U.S. at 678).

### d.    Analysis

Turning to the first *Brady* prong, the evidence at issue—the extent and nature of Belanger's involvement with law enforcement—was favorable to Washington because it buttressed Washington's defense by bolstering Belanger's credibility and undermining the police investigation. This evidence would have demonstrated that Detective Jensen and Detective Zepeda relied upon Belanger, showing her reliability as an informational source for police and showing her credibility as witness. Turning to the second *Brady* prong, although the defense may have known about this evidence because they met with Belanger on numerous occasions before trial and because Belanger informed them that she had done the controlled drug buy at 300 Madison Avenue (ECF No. 39-1 at 151, 212), the State readily admitted that the evidence was not turned over to the defense. (ECF No. 40-1 at 57-58.)

However, turning to the final *Brady* prong, the Nevada Supreme Court reasonably determined that Washington failed to demonstrate prejudice. Washington contends that "full and timely disclosure of the Brady evidence would have enabled counsel to impeach detectives Jensen and Zepeda's testimony discrediting Belanger as unreliable." (ECF No. 117 at 50.) However, significantly, as the Nevada Supreme Court reasonable determined, Washington was able to cross-examine the detectives during the State's rebuttal with this evidence. As such, although the suppressed evidence was untimely disclosed, it was disclosed before the conclusion of the trial, meaning that Washington's trial counsel was able to utilize the evidence to the defense's advantage. In fact, Washington's trial counsel capitalized on this evidence by impeaching Detective Jensen during cross-examination and highlighting this evidence during his closing argument. Washington fails to demonstrate that timely disclosure of this evidence would have resulted in his trial having a different outcome. *See Bagley*, 473 U.S. at 682.

Because the Nevada Supreme Court's denial of Washington's claim was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts, Washington is not entitled to federal habeas relief for ground 2a.

### 3.    Ground 2b—improper argument about Belanger

In ground 2b, Washinton alleges that the State engaged in misconduct and bad faith by arguing that Belanger was not a confidential informant. (ECF No. 16 at 25.)

### a.    Background information

Detective Jensen testified that a confidential informant is "[a] person [who] gives police information." (ECF No. 38-1 at 129.) Detective Jensen then testified that if a confidential informant has "proven themselves unreliable, . . . they're not used," elaborating that "[w]hen they perform the task that they agreed to perform, you use them[, but i]f they can't perform those tasks that they agreed to perform, then you cut them loose." (*Id*.)

During a hearing outside the presence of the jury, Detective Steven Perry testified about the difference between a citizen source and a confidential informant:

> A citizen source is usually not working for us to do controlled buys, things like that. A citizen source is more just for information. . . . [A] normal citizen on the street that finds out information and calls the police department and provides that information. . . . A confidential informant is - - goes through a screening process. They also go through background checks that we provide, and they work specifically for a detective and/or an officer.

(ECF No. 39-1 at 42, 55.) Later, Detective Zepeda testified before the jury that he never "use[d Belanger] as a confidential informant in regard to this case" and never "use[d] her after." (ECF No. 40-1 at 39.)

During the State's closing argument, the following comments were made about Belanger:

> A lot has been made about Devin Belanger and her testimony, and I'm sure counsel, because they're excellent attorneys, are going to get up here and also talk to you about Devin Belanger. And there is a lot of time that has been spent on Ms. Belanger and the things that she said.

I would submit to you, ladies and gentlemen, that she is not credible. She told you - - she sat in this witness stand, she sat over here, she looked at you and she said, I don't want to be here, and I don't want to be a part of this case.

Well, what's interesting about that is she gave several statements to police. Not only did she give statements to police, she called them and said she could get what she thought was the murder weapon. They ended up not using her. But what's interesting is that we have people on scene that were victims of this crime, and you heard about that, Anaya Pratt and Keith Thompson.

They were victims, and yet, when police talked to them they pretty much said, we don't want to fucking talk to you. We ain't going to say anything. You heard testimony from several patrol officers from this stand, that there were tons of people that were down there that day. There were tons of people that saw what happened. They had to corral witnesses and try and hold them, and yet, none of them gave statements in this case.

Devin Belanger told you she didn't want to be a part of it, and yet, how many times did she contact law enforcement to give a statement? Her testimony is belied by the evidence in this case. She said she doesn't want to be a part of it, and yet she constantly contacts law enforcement. She doesn't want to be a part of it, and yet, she gives three or four statements. And they're conflicting statements. And here's some of them.

She told Detective Jensen, at the time, that she was walking up Jackson near the new townhouse, and that's at the corner of F and Jackson when shots went off. And then she comes in here, and she says to you, oh, yeah, I'm on the phone at 1416 F Street. I'm right in front of the gate, and then, later on she actually changed it where she was.

She tells Detective Jensen that the shooter was wearing a white wife beater at the time of the shooting. But then she testifies that the shooter was wearing a red shirt, at the time.

She told Detective Jensen that - - or she never told him that there were two people on the balcony with guns. She never said that. And then she testified that there were two people standing up there with guns, one - - one silver and one black.

She told Detective Jensen that on July 24, 2011, Marcus Washington was wearing a red shirt, and then she came in here and she said to you, oh, it was a red and black shirt. And yet, you saw a picture from an earlier time that was used, where the defendant was wearing a red and black shirt. That picture wasn't taken from July 24, 2011.

She came in here and she never - - she never said anything about being a CI - - or actually, she never told Detective Berg. She said she was a CI, and she did a controlled buy. That's what she testified to. And yet, *she was never a CI*. You heard the testimony from the officers. She called them, they found out that there was an issue, and they took her home. And then three days later, she asked why she didn't get paid.

Devin Belanger is not credible. And she's not credible because if you look at the evidence in her case, it doesn't support what she's saying. She's saying that two people were standing out there with guns, one is shooting. I would submit to you, ladies and gentlemen, that if there are two people

1

standing there with guns, one of them isn't just going to stand there with the
gun and not shoot.

2

(ECF No. 41-5 at 57-59 (emphasis added).) The prosecutor also argued: "In this particular

3

case, the first time that we ever hear that she has details of her supposed CI involvement

4

where she's a confidential informant, that day is when? On the witness stand before you.

5

The first time." (*Id*. at 123-24.)

6

### b.    State court determination

7

In its affirmation of Washington's judgment of conviction, the Nevada Supreme

8

Court held "there is nothing in the record indicating that the prosecution knowingly

9

misrepresented Belanger's status as a confidential informant." (ECF No. 18-3 at 7.)

10

### c.    Analysis

11

A prosecutor may "not manipulate or misstate the evidence." *Darden*, 477 U.S. at

12

82. The Nevada Supreme Court reasonably determined that Washington fails to

13

demonstrate that the prosecutor committed such an error. The parties dispute whether

14

Belanger fell within the definition of a confidential informant. According to the defense,

15

because Belanger provided information to the police, she qualified as a confidential

16

informant. Comparatively, the State argued that Belanger did not qualify as a confidential

17

informant because she did not complete the screening process or perform tasks at the

18

direction of law enforcement. A disagreement about a fact does not make one party's

19

interpretation of that fact a misstatement. Therefore, the State's argument that Belanger

20

was not a confidential informant was just that—an argument. And the jury was told that

21

"[s]tatements, arguments and opinions of counsel are not evidence in the case." (ECF

22

No. 41-6 at 8.) Because the Nevada Supreme Court's denial of Washington's claim was

23

neither contrary to, nor an unreasonable application of, clearly established federal law

24

and was not based on an unreasonable determination of the facts, Washington is not

25

entitled to federal habeas relief for ground 2b.

26

### 4.    Ground 2c—presenting false testimony

27

In ground 2c, Washington alleges that the State engaged in misconduct by

28

presenting false testimony. (ECF No. 16 at 30.) Specifically, Washington argues that the

following evidence was falsely presented by the State: (1) Belanger approached Detective Jensen about purchasing the murder weapon from Washington rather than Detective Jensen approaching Belanger; (2) Belanger had not assisted law enforcement as either a confidential informant or citizen source; (3) Belanger made statements to Detective Zepeda incriminating Washington; (4) the investigations by Detective Perry and Detective Zepeda were independent of each other; and (5) the arrest of Washington at 300 Madison Avenue was a coincidence. (ECF No. 117 at 66.)

### a.    State court determination

In its affirmation of Washington's judgment of conviction, the Nevada Supreme Court held: "Washington's argument that the State knowingly used false testimony lacks merit because there is nothing in the record indicating that the prosecution knowingly misrepresented Belanger's status as a confidential informant." (ECF No. 18-3 at 7.)

### b.    Standard

"[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). This rule applies "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears" and when "the false testimony goes only to the credibility of the witness." *Id*. A *Napue* violation claim will succeed when "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (internal quotation marks and alteration omitted). "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Agurs*, 427 U.S. 97, 103 (1976).

### c.    Analysis

The Nevada Supreme Court reasonably determined that Washington failed to demonstrate that the State knowingly presented false evidence. Turning first to whether

Belanger reached out to Detective Jensen or Detective Jensen reached out to Belanger to purchase the gun and whether Detective Perry's and Detective Zepeda's investigations into 300 Madison Avenue were commingled or independent, this evidence lacks materiality. This evidence, at most, has some impeachment value as to the investigation into Hicks's murder, but Washington fails to demonstrate that it rises to the level of having any reasonable likelihood of affecting the jury's verdict. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) ("A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'"). Turning next to Belanger's actions not amounting to her being a confidential informant or citizen source and the arrest of Washington at 300 Madison Avenue being merely a coincidence, these are matters of interpretation and opinion—not evidence that is demonstrably deceitful or fraudulent. Finally, turning to Belanger's alleged statements to Detective Zepeda incriminating Washington, Washington argues that this testimony "is simply absurd" and "farcical" because (1) Belanger told Detective Jensen on numerous occasions just days before speaking with Detective Zepeda that Owens was the shooter; and (2) Detective Zepeda could not remember Belanger three days before testifying at Washington's trial. Even if the accuracy of Detective Zepeda's testimony is questionable, Washington fails to demonstrate that this evidence was false. Implausible and inconsistent testimonies are fodder for argument—they do not show that testimony was fabricated.

Because the Nevada Supreme Court's denial of Washington's claim was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts, Washington is not entitled to federal habeas relief for ground 2c.

### C.    Ground 3--Ineffective Assistance of Counsel

#### 1.    Procedural default

The Court previously determined that ground 3 is procedurally defaulted and deferred consideration of cause and prejudice to overcome the procedural default until the time of merits review. (ECF No. 66 at 5.)

To overcome a procedural default, a federal petitioner must show: (a) cause for the procedural default and actual prejudice from the alleged violation of federal law; or (b) that a fundamental miscarriage of justice will result in the absence of review, based on a sufficient showing of actual factual innocence. *See, e.g.*, *Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003). Under *Martinez v. Ryan*, a petitioner can demonstrate cause to potentially overcome the procedural default of a claim of ineffective assistance of trial counsel by demonstrating that either (a) he had no counsel during the state post-conviction proceedings or (b) such counsel was ineffective. *See* 566 U.S. 1, 14 (2012). To demonstrate "prejudice" under *Martinez*, the petitioner must show that the defaulted claim of ineffective assistance of trial counsel is a "substantial" claim. *Id*. A claim is "substantial" for purposes of *Martinez* if it has "some merit," which refers to a claim that would warrant issuance of a certificate of appealability. *Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019). This standard does not require a showing that the claim will succeed, but instead only that its proper disposition could be debated among reasonable jurists. *See generally Miller-El v. Cockrell*, 537 US. 322, 336-38 (2003).

The principal issues before the Court therefore, in context,[5] are: (1) whether Washington's ineffective-assistance-of-trial-counsel claim is substantial; (2) if so, whether Washington's state postconviction counsel was ineffective in raising the claim in the state district court; and (3) if so, whether, on the merits, Washington was denied effective assistance of trial counsel. *See, e.g., Atwood v. Ryan*, 870 F.3d 1033, 1059–60 (9th Cir. 2017); *Detrich v. Ryan*, 740 F.3d 1237, 1243–46 (9th Cir. 2013). On all such issues, the Court's review is de novo. *See Ramirez v. Ryan*, 937 F.3d 1230, 1243 (9th Cir. 2019); *Atwood*, 870 F.3d at 1060 n.22.

---

[5] It has not been disputed herein (1) that a state postconviction proceeding in the state district court was an initial-review collateral proceeding for purposes of *Martinez*, or (2) that Nevada procedural law sufficiently requires an inmate to present a claim of ineffective assistance of trial counsel for the first time in that proceeding for purposes of applying the *Martinez* rule. *See generally Rodney v. Filson*, 916 F.3d 1254, 1259–60 (9th Cir. 2019). The Court does not dwell further over these additional contextual background requirements.

### 2.    Standard for ineffective assistance of counsel claims

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel, requiring a petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness;" and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

### 3.    Ground 3a—failure to object to the evidence on rebuttal

In ground 3a, Washington alleges that his trial counsel was ineffective for failing to object to and move to strike evidence presented by the State on rebuttal. (ECF No. 16 at 42.) Specifically, Washington contends that his trial counsel failed to object to and move to strike the State's rebuttal evidence pertaining to Belanger's interaction with and statement made to law enforcement. (*Id*.)

As was discussed in ground 2a, the State untimely disclosed the extent and nature of Belanger's involvement with law enforcement. This evidence had exculpatory value for the defense because it bolstered Belanger's credibility and undermined the police investigation. Accordingly, it is nonsensical that the defense would have wanted to object to or strike this evidence. Because Washington fails to demonstrate ineffectiveness under

*Strickland*, ground 3a is not substantial, so Washington fails to demonstrate the requisite prejudice necessary to overcome the procedural default. Ground 3a is dismissed.

### 4.    Ground 3b—failures regarding false evidence

In ground 3b, Washington alleges that his trial counsel was ineffective for failing to impeach, object to, and/or move to strike demonstrably false evidence presented by the State on rebuttal. (ECF No. 16 at 45.)

During Detective Zepeda's testimony, at a bench conference, Washington's trial counsel stated that, "at the end of this, I'm going to move for a mistrial," explaining that he was "sincerely, sincerely worried about what [he was] hearing here, that [Belanger] made all these statements" because "[t]here's no recording of it" and "nothing to substantiate what [Detective Zepeda] is saying." (ECF No. 40-1 at 48, 54.) Washington's trial counsel then stated, "so I'd say at this point either [the State] hand[s] over the documents connected with that information [regarding 300 Madison Avenue that had not previously been provided] or we get a mistrial." (*Id*. at 56.) The parties argued this point extensively. (*See id*. at 48-82.)

For the reasons discussed in ground 2c, in which this Court found that the Nevada Supreme Court reasonably determined that the State did not knowingly present false testimony, this Court finds that Washington fails to demonstrate that his trial counsel was ineffective. Further, Washington's trial counsel argued that it was suspicious that (1) Belanger told Detective Zepeda that Washington was the shooter since there was nothing to substantiate that claim and it was contradictory to her other statements to Detective Jensen; and (2) Detective Zepeda only came forward with this information after Belanger testified at the trial. Because the trial court was not accepting of these suspicions, it is mere speculation that the trial court would have sustained any objection or granted any motion to strike the State's evidence during rebuttal.

Because Washington fails to demonstrate ineffectiveness under *Strickland*, ground 3b is not substantial, so Washington fails to demonstrate the requisite prejudice necessary to overcome the procedural default of ground 3c. Ground 3c is dismissed.

### 5.    Ground 3c—failure to object to hearsay

In ground 3c, Washington alleges that his trial counsel was ineffective for failing to object or moving to strike inadmissible hearsay testimony elicited from Detective Zepeda. (ECF No. 16 at 49.)

As was more fully discussed in ground 1b, Detective Zepeda testified for the State on rebuttal that Belanger told him that she was a witness to Hicks's homicide and that Washington was the shooter, describing Hicks "as being killed like a dirty dog." (ECF No. 40-1 at 26-27.) As was discussed in ground 1b, this testimony was inadmissible hearsay, so Washington demonstrates that his trial counsel acted deficiently in not objecting to this testimony. As was also discussed in ground 1b, this testimony was highly prejudicial given that (1) it entirely contradicted the defense's case that Owens was the shooter and (2) the evidence of Washington's guilt was slim. Consequently, Washington demonstrates that his trial counsel's representation fell below an objective standard of reasonableness and that, but for these errors, the result of his trial would have been different. Because ground 3c is substantial, Washington's state postconviction counsel was ineffective in raising this claim in the state court, and Washington was denied the effective assistance of trial counsel, Washington is granted federal habeas relief for ground 3c.

### 6.    Ground 3d—failures regarding bad act evidence

Washington alleges that his trial counsel was ineffective for opening the door and stipulating to the State's presentation of inadmissible bad act evidence and for failing to object to improper argument relating to the bad act evidence by the State during closing statements. (ECF No. 16 at 51.) Specifically, Washington contends that it was unreasonable for his trial counsel to emphasize the existence of a firearm that was found in the residence where Washington was arrested, highlighting that the firearm was not a match for the murder weapon, rather than to point to the absence of a murder weapon. (*Id*. at 56.)

///

///

1

### a.    Background information

During opening statements, Washington's trial counsel made the following comments:

> And what you're going to learn is when they arrested him in his home, they tried to say things in the reports that you're going to learn about that make Marcus look bad. They say that Marcus was trying to dispose of evidence when they came in, that they attribute a gun to him, a murder weapon, a black 9-millimeter gun, and they say like he's trying to get rid of this thing.
>
> So you just heard an Information, the charging document. You heard that it was filed on August 23, 2011. On September 21, 2011, less than a month later, they told Judge Smith, We're going to execute this young man, file notice of intent to execute. But see, their testing for the gun hadn't come back. And while we're preparing for trial, on November 8, 2011, the gun that they said was the murder weapon proved not to be the murder weapon. And I suggest, ladies and gentlemen of the jury, that's why the State didn't mention a word about that to you. It proved negative. Science showed that that was not the gun.
>
> And the DNA, there's a DNA scientist. . . . And she tested that gun because they now found that it was not the murder weapon, they want to see, does it connect to Marcus. It's not his DNA on the gun. And the house he was arrested in wasn't his.

(ECF No. 36-2 at 28–29.) Later, outside the presence of the jury, after the State argued about the improper nature of Washington's trial counsel's opening statement regarding the Notice of Intent to Seek the Death Penalty being filed prematurely, Washington's trial counsel informed the trial court that part of his trial strategy was to allege that the State "jumped the gun" and there was a "rush to judgment." (ECF No. 38-1 at 22.) Also, outside the presence of the jury, the State made the following argument:

> It's my understanding that they want to call other detectives that were on scene at 300 Madison to discuss the circumstances of the gun. The State believes that if they get into that area with those detectives, we are allowed to bring in the fact that there are undercover buys going on, that there was a search warrant going on, there was drugs there, that there was a gun found in the wall and that there were bullets found in the toilet. We're able to get into all of the circumstances that happened at 300 Madison. We stayed away from it because of the potential issues.

(ECF No. 37-1 at 80–81.) The trial court then commented, "I'm kind of thinking [the defense] opened that door." (*Id*. at 82.) Washington's trial counsel responded, "when I

30

make these decisions to say something like that in an opening argument, I recognize what I'm doing." (*Id*. at 83.)

Washington's trial counsel later cross-examined Detective Perry about the narcotics search warrant that was served on 300 Madison Avenue, implying that the search warrant was pretextual and actually a search for the gun involved in Hicks's murder. (ECF No. 40-1 at 134-137.) The State made the following argument during a bench conference:

> We believe that the door has been open[ed] now to [the detective] explaining exactly what went down that day from his perspective, how SWAT was called in, that they went in and did what they did at the scene, not just the buy issue but what had transpired before, and again, who was present in the house, that kind of stuff, because clearly the implication is this was a pretext to get a gun only and not to do anything with drugs.
>
> And clearly when SWAT hit the house, there's screaming and yelling going on. They end up finding bullets being - - tried being flushed down the toilet. They don't find really any drugs, maybe a little residue or something similar, but nothing of any import, and that's why - - that's why there [were] no drugs recovered from the scene in the search warrant.
>
> So all of that stuff now, it comes in. We kept it out initially, but I think at this point it's opened the door to at least getting into all of that stuff which says that there was only three people present in the house. The house is a relatively small house, but when they enter the house, what did they see? Bullets lying around, bullets in the toilet, . . . that's where we should be able to go.

(*Id*. at 138-139.) Washington's trial counsel objected. (*Id*. at 139.) However, the trial court ruled that it was "going to let them ask it" because Washington's trial counsel "opened the door." (*Id*.) Washington's trial counsel then explained, "[f]or the record, I object, but if you're going to allow it in, then I'll stipulate" because "[t]hat way it's sanitized and we don't get out something that we don't want to hear." (*Id*. at 142.) The State later read the following stipulation to the jury:

> The stipulation is related to 300 Madison address, that at the time of the execution of . . . the search warrant at - - at the 300 Madison location, that it was a very small house, that the SWAT team was used in the execution of that search warrant, that during the execution of the search warrant, there was a lot of yelling, and inside the house they eventually go into the house, and at the time there were three people located at that address. A male by the name of Terrence Manghum, a female and Marcus Washington were

the three occupants of the house; that as they entered, there are bullets, meaning live cartridges strewn about the floor, there are two magazines found at different locations within the home. . . . And when I say magazine, they're - - they're the items that go inside a semiautomatic weapon. One was an extended clip, the other one was a regular clip. Those had unexpended cartridges within them. That, in addition to that, in the bathroom area - - there was one bathroom. In the bathroom area, there was a depression where somebody had knocked a hole into the drywall area and a gun, the Glock that's been questioned about, was found sitting inside that wall area; that the toilet in the bathroom, inside the toilet were unexpended live rounds of ammunition sitting in the water in the bowl at that location. And that obviously this was an execution of a search warrant based on the controlled buy of narcotics at that location.

(*Id*. at 252-253.)

During closing arguments, after explaining that the jury could not use the bad act evidence regarding the search of 300 Madison Avenue "to prove that [Washington] is a person of bad character or to prove that he has a disposition to commit crimes," the State argued the following: "the reason that those photographs [of 300 Madison Avenue] and the stipulation are important . . . is that that is the house that Marcus Washington chose to run to. That's the house he chose to hide from the police." (ECF No. 41-5 at 127.)

### b. Analysis

It is undisputed that evidence involving the search of 300 Madison Avenue— including the fact that controlled drug buys occurred there, and a firearm and firearm paraphernalia were found there—amounted to inadmissible bad act evidence against Washington. *See* NRS § 48.045(2) (proving that "evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith"). Thus, if Washington's trial counsel had not opened the door to this evidence, it would not have been admitted.

Washington's trial counsel told the trial court that he strategically opened the door to this evidence because the defense theory, at least in part, was that the police "jumped the gun" and "rush[ed] to judgment" in arresting and charging Washington before finishing their investigation. To support this theory, the defense presented evidence that (1) the search warrant for 300 Madison Avenue was merely pretextual and that the police

1   wrongly believed that the gun used to kill Hicks was located at this location, and (2) the

2   only gun found at the location did not match the gun used to kill Hicks.

3          The Court finds this strategy fell below an objective standard of reasonableness.

4   Evidence that a gun, semiautomatic gun magazines, and ammunition were found in

5   Washington's constructive possession when he was arrested was unquestionably

6   detrimental to Washington. Even considering the supposedly curative jury instruction,[6] it

7   is reasonably likely that the inference that Washington was a criminal who associated

8   with drug dealers, had access to firearms, and was the type of person who would destroy

9   or conceal evidence precluded the jury from weighing all the evidence carefully and

10  enticed the jury into convicting Washington on the basis of his suspicious character and

11  other bad acts. Indeed, arguing that the police entered 300 Madison Avenue to seize the

12  murder weapon rather than drugs only slightly impeached the credibility of the police

13  investigation. The juxtaposition of this marginally beneficial evidence to the admission of

14  highly prejudicial bad act evidence, especially when considering this was a close case

15  that rested on vague and inconclusive eyewitness accounts, is alarming.

16         Accordingly, Washington demonstrates that his trial counsel's representation fell

17  below an objective standard of reasonableness and that, but for this error, the result of

18  his trial would have been different. Because ground 3d is substantial, Washington's state

19  postconviction counsel was ineffective in raising this claim in the state court, and

20  Washington was denied the effective assistance of trial counsel, Washington is granted

21  federal habeas relief for ground 3d.

22  ///

23  ///

24  ///

25  
―――――――――――――

26         [6]The jury was instructed that "[a]ny evidence that the defendant committed
    offenses other than that for which he is on trial, if believed, may not be considered by you
27  to prove that he is a person of bad character or to prove that he has a disposition to
    commit crimes. Such evidence was received because it was not possible to admit other
28  relevant evidence and, at the same time, exclude evidence of other crimes." (ECF No.
    41-6 at 15.)

1

2           7.       **Ground 3e—failure to object to the closure to the public**

3         In ground 3e, Washington alleges that his trial counsel was ineffective for failing

to object to the closure to the public of his trial during Williams's testimony. (ECF No. 16

4    at 58.)

5              **a.    Background information**

6         Before calling Williams to testify, the State made the following comments:

7
    [B]ecause of the issues that have taken place with Mr. Williams in this case,
8        and I have been present, I think the Court's been present in court – actually
    in court proceedings where family members or acquaintances or whomever
9        they are come in and actually sit down behind Mr. Williams and make
    statements like, You're not going to testify in this case. You're not going to,
10       you know, finger Marcus Washington, that kind of thing. Because of the
    family influence and the concern as to why he's in custody is, in part, to
11       eliminate that family influence so that he can actually testify and he can
    show up. We would ask that although these are public proceedings that
12       during [Williams's] testimony that the Court exclude all witnesses – all
    members from the court except for the persons that need to be here,
13       meaning family members, associates and so forth on both sides . . . so that
    there's no undue influence of him while he's testifying.
14

15   (ECF No. 37-1 at 43-44.) The trial court responded, "I think that's fair." (*Id*. at 44.) The trial

16   court then ruled that "[t]he courtroom will be cleared during Mr. Williams' testimony, both

17   sides. And then after Mr. Williams' testimony, then they can be let back in." (*Id*.)

18   Washington's trial counsel noted his objection for the record. (*Id*.)

19        The State later described Williams's family's influence as follows:

20
    [A]t the last calendar call in December, Donald Williams' brother was here
21       actually threatening him and telling him not to testify. The Court then put
    him into custody. When our investigator went down to serve Donald
22       Williams, the family was there threatening him. When [Williams's counsel]
    went out there to actually talk to Donald Williams, the Washington family
23       was also there threatening Donald Williams not to testify.

24   (ECF No. 39-1 at 9.) Williams confirmed these events, testifying that his family members

25   told him not to testify against Washington. (ECF No. 37-1 at 227-29.)

26             **b.    Analysis**

27        Because Washington's trial counsel objected to the closure of the courtroom, it is

28   not readily apparent that Washington's trial counsel's actions regarding the closure were

1   unreasonable. *See, e.g.*, *United States v. Litteral*, 910 F.2d 547, 554 (9th Cir. 1990)

2   (finding that counsel was not ineffective in representing the defendant where, although

3   counsel could have more effectively developed facts in support of a motion, counsel more

4   than adequately presented defendant's motion). Indeed, "[r]are are the situations in which

5   the wide latitude counsel must have in making tactical decisions will be limited to any one

6   technique or approach." *Harrington*, 562 U.S. at 106; *see also Strickland*, 466 U.S. at

7   688-89 ("No particular set of detailed rules for counsel's conduct can satisfactorily take

8   account of the variety of circumstances faced by defense counsel or the range of

9   legitimate decisions regarding how best to represent a criminal defendant."). However,

10  even if Washington's trial counsel's actions were deficient—for example, for failing to hold

11  the trial court to its requirements of considering all reasonable alternatives to closure and

12  making findings before closing the courtroom[7]—he fails to demonstrate prejudice.

13          "[W]hen a defendant raises a public-trial violation via an ineffective-assistance-of-

14  counsel claim, . . . the burden is on the defendant to show either a reasonable probability

15  of a different outcome in his or her case or . . . to show that the particular public-trial

16  violation was so serious as to render his or her trial fundamentally unfair." *Weaver v.*

17  *Massachusetts*, 582 U.S. 286, 300-01 (2017). Regarding the former demonstration of

18  prejudice, Washington argues that the outcome of his trial would have been different if

19  the trial court had not closed the proceedings because closing the proceedings swayed

20  the jury's credibility determination as to Williams's testimony exculpating Washington.

21  (ECF No. 117 at 111.) This Court disagrees. Williams expressed a desire to not come to

22  court because his family members were pressuring him not to testify. The trial court could

23  have reasonably found that closure was justified under these circumstances. *See United*

24  *States v. Rivera*, 682 F.3d 1223, 1236 (9th Cir. 2012) ("A number of important interests

25  have been recognized as justifying closure: e.g., protecting a witness's dignity in a rape

26          [7]"[T]he party seeking to close the hearing must advance an overriding interest that

27  is likely to be prejudiced, the closure must be no broader than necessary to protect that
    interest, the trial court must consider reasonable alternatives to closing the proceeding,

28  and it must make findings adequate to support the closure." *See Waller v. Georgia*, 467
    U.S. 39, 48 (1984).

trial; protecting witnesses from fear of testifying; and preventing the courtroom from descending into chaos."). Turning to the latter demonstration of prejudice, Washington argues that prejudice is presumed here because the closure rendered his trial fundamentally unfair. (ECF No. 117 at 108-10.) Again, this Court disagrees. Contrary to Washington's assertions, the absence of Williams's family members rendered Williams more likely to testify truthfully, negating a finding that the closure of the trial implicated fundamental fairness concerns.

In sum, Washington fails to demonstrate either deficient performance or prejudice, so ground 3e is not substantial. Because Washington fails to demonstrate the requisite prejudice necessary to overcome the procedural default of ground 3e, ground 3e is dismissed.

## V.    MOTION FOR EVIDENTIARY HEARING

Washington moves for an evidentiary hearing so he can present additional evidence in support of his prosecutorial misconduct claims in grounds 2a and 2c. (ECF No. 120 ("Motion").) Washington argues that he is entitled to an evidentiary hearing because he explicitly requested one before the state court, the state court denied his request, and he did not have a full opportunity to litigate his claims in state court. (*Id.*) Respondents opposed the Motion, contending, in part, that *Pinholster* bars factual development of grounds 2a and 2c. (ECF No. 124.) Washington replied, asserting that grounds 2a and 2c should be reviewed de novo so the restraints of *Pinholster* do not apply. (ECF No. 125.)

> U.S.C. § 2254(e)(2) provides as follows:
> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
> (A)    the claim relies on--
>     (i)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>     (ii)    a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional

> error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

In *Shinn v. Ramirez*, the Supreme Court of the United States reinforced that when reviewing a federal habeas petition, the federal court may not consider any facts beyond the factual record presented to the state post-conviction relief court, unless one of the exceptions of 28 U.S.C. § 2254(e)(2) applies. *See* 596 U.S. at 382.

Because the Court has already determined that review under a de novo standard is not warranted for grounds 2a and 2c, supplementing the record for these grounds is prohibited. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"). Therefore, even if Washington did not fail to develop the factual bases of grounds 2a and 2c, the Court is precluded from holding an evidentiary hearing on these claims. Moreover, the Court has already determined that Washington is not entitled to relief on grounds 2a and 2c, and further factual development would not affect this Court's reasons for denying relief. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record . . . otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

Accordingly, the motion for an evidentiary hearing is denied.

## VI.    CONCLUSION

It is therefore ordered that Washington's First Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 16) is granted as to grounds 1, 3c, and 3d. Petitioner Marcus Washington's judgment of conviction filed on June 29, 2012, in case number C275618-1, in the Eighth Judicial District Court for the State of Nevada is vacated. Within 180 days[8] of the later of (1) the conclusion of any proceedings seeking appellate or certiorari review of the Court's judgment, if affirmed, or (2) the expiration for seeking such appeal or review, the state court must—consistent with this Order—commence a retrial.

///

_____

[8]Reasonable requests for modification of this time may be made by either party.

1    It is further ordered that the motion for evidentiary hearing (ECF No. 120) is denied.

2    It is further ordered that, to the extent necessary, a Certificate of Appealability is

3    denied as to the remaining grounds.

4    The Clerk of Court is further directed to (1) substitute Jeremy Bean for Respondent

5    Warden William Gittere, (2) enter judgment accordingly, (3) provide a copy of this Order

6    and the Judgment to the Clerk of the Eighth Judicial District Court for the State of Nevada

7    in connection with that court's case number C275618-1, and (4) close this case.

8    DATED THIS 15th Day of January 2025.

9

10   _____

11   MIRANDA M. DU
     UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38